UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ROBERT J. ATKINS, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 4:15 CV 933 CDP |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

# MEMORANDUM AND ORDER

This rails-to-trails case is before me on the plaintiffs' motion for class certification. Plaintiffs seek compensation for the government's alleged taking of their private property for public use when the Surface Transportation Board, following the procedures set out in the National Trails System Act, authorized use of an abandoned rail line as a recreational trail. I held a hearing on plaintiffs' motion on March 3, 2016. Because plaintiffs have failed to show that questions common to the class predominate over questions affecting only individual members, they have failed to satisfy Fed. R. Civ. P. 23(b)(3), and I will deny the motion for class certification.

## Background

Plaintiffs are owners of nine parcels of property along a 144.3-mile corridor in the State of Missouri which was formerly used as a railroad line by the Missouri Central Railroad Company and the Central Midland Railway Company. The

railroad line operated over numerous parcels of private property through various easements. Plaintiffs seek to represent a class that would include themselves and more than 325 other Missouri property owners whose property is similarly situated along the former railroad line. In February of 2015 a Notice of Interim Trail Use (NITU) was issued, which triggered plaintiffs' claim here. They contend that the use of the National Trails System Act to allow the abandoned rail line to be used as a trail interferes with their exclusive rights over their properties and is therefore a government taking for which they are owed compensation under the Fifth Amendment to the United States Constitution.

The National Trails System Act, 16 U.S.C. §§ 1241-1251 (2000), allows abandoned railroad lines to be converted to recreational trails:

> In general terms, once a railroad abandons use of its track, the fee owners of the burdened estate automatically gain their reversionary interest in the easement. The aegis behind the Trails Act is exploitation of railroad property interests by granting easements to third parties for alternative uses of the land where railroad tracks previously traversed. The Trails Act preserves the railroad's right-of-way by affording a State, municipality, or private group an opportunity (1) to negotiate with a railroad (2) to assume temporary managerial responsibility (3) to implement an interim use of the land (4) to build recreational trails. If an agreement is reached, the interim trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d) (2000). This process has been termed "railbanking."
>
> The railbanking process typically starts when a railroad files an application, or other documentation, with the Surface Transportation Board (the "STB") stating its intention to abandon part of a line. The STB then publishes a notice of exemption in the Federal Register. To

> avoid abandonment of the track, and take advantage of the Trails Act, a state, municipality, or private group can file a railbanking petition with the STB. If the railbanking petition is sufficient, and the railroad agrees to negotiate, the STB issues a NITU, which allows the railroad to salvage track and equipment, discontinue service, and prepare for the interim use without actually abandoning the railroad line. If subsequent negotiations between the railroad and the applicant for interim trail use are successful, the NITU extends indefinitely; the STB retains jurisdiction for potential future railroad use; and the reversionary interests of the surrounding landowners, which would ordinarily vest upon abandonment of the rail line by the railroad, continue to remain dormant until actual abandonment.

*Fauvergue v. United States*, 86 Fed. Cl. 82, 85 (2009) (footnote and citations omitted), *rev'd on other grounds sub nom. Bright v. United States,* 603 F.3d 1273 (Fed. Cir. 2010).

The plaintiffs contend that under Missouri property law the Railroads' abandonment of the rail line would terminate their respective easements. That would result in the property interests in the affected properties being reverted to the property owners, who would then enjoy exclusive rights over their private property – free of any easements. Plaintiffs argue that the government's issuance of the NITU interfered with this exclusive right to own and enjoy their property.

Most claims raised by property owners seeking compensation because of the Trails Act have been brought in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See, e.g., Brown v. United States,* 126 Fed. Cl. 571 (2016), and cases discussed there. This case is brought in this Court under the "Little Tucker Act," which provides concurrent jurisdiction in the district courts

for claims against the government that do not exceed $10,000. 28 U.S.C. § 1346(a)(2). Accordingly, to proceed in this Court in this takings case, each individual claim here must either not exceed $10,000 or the respective property owner must waive any claim exceeding $10,000.

There are two actions currently pending in the Court of Federal Claims that involve the same NITU and the same rail line at issue here: *Abbott v. United States* (364 plaintiffs/582 parcels of land)[1] and *Behrens v. United States* (57 plaintiffs/71 parcels of land).[2] Those cases are not proceeding as class actions. Instead, all plaintiffs and parcels are proceeding by joinder through the filing of amended complaints.

## Discussion

A party seeking class certification must satisfy the four prerequisites of Rule 23(a), Federal Rules of Civil Procedure: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. In addition to the Rule 23(a) prerequisites, class-seeking parties must also satisfy one of the provisions of Rule 23(b). The plaintiffs here invoke Rule 23(b)(3): that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods

---

[1] Case No. 1:15CV211 (Fed. Cl.).
[2] Case No. 1:15CV421 (Fed. Cl.).

for fairly and efficiently adjudicating the controversy."[3] The party seeking class certification bears the burden of proving by a preponderance of the evidence that the requirements of Rule 23 are met. *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 371 (8th Cir. 2013); *Jackson v. Crawford*, No. 12-4018-CV-C-FJG, 2015 WL 2173646, at *2 (W.D. Mo. May 8, 2015).

Although defendants challenge plaintiffs' ability to show the numerosity and typicality requirements of Rule 23(a), I conclude that the obvious lack of a predominant common question under Rule 23(b)(3) is a sufficient basis to deny the motion, so I need not discuss the Rule 23(a) requirements.[4]

The plaintiffs' claims all arise out of the same NITU and so there is no doubt that at least one common question exists. The initial commonality requirement under Rule 23(a) is not stringent: "In *Dukes*, the Court acknowledged that a single common question 'will do' for purposes of rule 23(a)(2)," *Ebert v. General Mills, Inc.*, -- F.3d --, No. 15-1735, 2016 WL 2943193, at *4 (8th Cir. May 20, 2016) (quoting *WalMart Stores, Inc. v. Dukes,* 564 U.S. 338, 359 (2011)).

It is the more demanding predominance requirement of Rule 23(b)(3) that is the crucial issue in this case. As the Supreme Court noted in *Comcast Corp. v.*

---

[3] Plaintiffs' motion and brief argued that this case also meets the requirements under Rule 23(b)(2) because the government had acted on grounds that applied generally to the class, but at the hearing counsel acknowledged that provision is not applicable because plaintiffs do not seek declaratory or injunctive relief. *See WalMart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011).

[4] Certainly in most cases, more than 300 plaintiffs would be considered sufficiently numerous to meet the Rule 23(a)(1) requirement, but *Brown, supra,* and other rails-to-trails cases indicate that issue may not be as simple as most cases that come before this Court. In any event, I need not decide it.

*Behrend,* 133 S. Ct. 1426 (2013), it is the court's "duty to take a 'close look' at whether common questions predominate over individual ones." *Id.* at 1432 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997)).

> The predominance inquiry under Rule 23(b)(3)
>
> calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196-97 (5th ed. 2012)). "When 'one or more of the central issues in the action are common to the class *and can be said to predominate*, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages[.]'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-24 (3d ed. 2005)) (emphasis added).

To establish their takings claim here, plaintiffs will be required to prove the following elements: 1) that the government took action in relation to particular segments of the railroad line, 2) that the property owners own the fee interest in the land abutting the segments or underneath, and 3) the amount of compensation that is just. *See Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996); *Rogers v. United States*, 90 Fed. Cl. 418, 427-28 (2009). "A court must analyze

[the] elements in order to determine which are subject to common proof and which are subject to individualized proof." *In re High Tech. Emp. Antitrust Litig.*, 289 F.R.D. 555, 564 (N.D. Cal. 2013) (internal quotation marks and citation omitted).

From the evidence presented, it appears that the only common question in this case is whether there was government action that affected segments of the railroad line at issue. While this common question may be the "glue" that holds the claims together, it is not an open question, given that the government concedes that it engaged in the triggering action, that is, the issuance of the NITU on February 25, 2015.

What remains to be litigated is whether each plaintiff owns the fee interest in each affected parcel (liability) and, if so, what compensation is just (damages). Because the determination of these remaining questions requires highly individualized proof, it cannot be said that the sole common question in this action – which itself is conceded – predominates over questions affecting only the individual landowners.

At the class certification hearing, plaintiffs' counsel said that his team has examined the deeds relating to all of the properties affected by the NITU and concluded that approximately 325 parcels fit within the parameters of this action, that is, that the railroad line operated by way of easement over these privately owned properties. Plaintiffs contend that there are three methods by which the easements exist in this case: 1) condemnation, 2) prescriptive easement, and 3) $1

deeds. Plaintiffs aver that there are 69 putative class members in the first two categories and 254 putative class members with $1 deeds.[5]

Plaintiffs argue that determining fair market value can be done by appraisals on all properties using one set of instructions. Each individual property will be given an actual appraisal; there will be no estimates. With each appraiser operating under the same set of instructions, plaintiffs contend that there will be no differing methodologies in measuring damages. From these appraisals, the properties would be placed into groups based on the properties' characteristics, *e.g.*, commercial, residential, farmland, etc. In the event the matter goes to trial, plaintiffs intend to present that evidence to the jury in groups and using representative parcels from each group. From the jury's verdict – group by group – all properties would be awarded compensation as determined by the jury for each respective group.

The government contends that individual litigation will be required with regard to both the ownership issues and valuation. It posits that an examination of each deed relating to each affected parcel would be necessary to determine ownership interest on the date of valuation; the $1 deeds with the Railroads would need to be examined individually to determine whether additional, non-monetary consideration was provided, which may mean that the fee title was conveyed to the

---

[5] According to plaintiffs, there are 21 property owners who have deeds showing consideration exceeding $1, and those may require specific litigation, because there is some contention that a deed listing more than $1 may indicate that the Railroads actually own the fee.

Railroads; and examination of the individual deeds would be necessary to determine if trail use exceeds the scope of the easement for that particular parcel.

With regard to valuation, the government identified several characteristics that will be relevant to determining the value of the properties at issue, including environmental factors, zoning, size, location, which county, sale history, severance issues, and proximity issues. The government contends that while appraisers would be operating under a uniform standard, the written standard itself is over 100 pages long because it must account for all of the different variables that must be considered when assessing property values.

Even if plaintiffs' proffered single methodology were used to value all of the properties, the appraisers would be required to consider numerous variables unique to each individual property. Indeed, "[e]very tract of land is recognized as having a unique value[.]" *Kay v. Vatterott*, 657 S.W.2d 80, 82 (Mo. Ct. App. 1983). Determining which variables apply to each property would require highly individualized proof.

Two relatively recent Court of Federal Claims rails-to-trails cases faced issues similar to those here. In *Brown v. United States,* 126 Fed. Cl. 571 (2016), the court found that common questions did not predominate because, among other things, individual determinations of the scope of the railroad's easements were required. In *Turner v. United States*, 115 Fed. Cl. 614 (2014), the court noted that the threshold issue of liability regarding the trail had already been resolved in other

actions, but Rule 23(b)(3) was not satisfied given that all that remained for the court's determination were questions of "liability and just compensation with a factual analysis that is unique to each individual claim." *Turner*, 115 Fed. Cl. at 618.[6]

Here, as in *Turner* and *Brown*, the factual analysis regarding the actual ownership interest in each of the more than 325 properties at issue (liability), as well as to the encumbered and unencumbered values of each property (damages), will be unique to each individual claim and subject to individualized proof. Where the only common question has been resolved, it cannot be said to predominate over the highly individualized questions that remain. Indeed, as recognized in *Ebert,* highly individualized factual questions regarding damages may overwhelm common questions of liability to such a degree that class certification is inappropriate. 2016 WL 2943193, at *4-5. Although plaintiffs contend that they can present representative samplings for purposes of assessing damages, I question whether the use of such samplings would be permissible under *Bouaphakeo* in the circumstances of this case, given the proposed development of adequate, individualized evidence as to each property's value.[7]

---

[6] The Eighth Circuit's recent *Ebert* case – while not involving rails-to-trails – is similarly instructive. That case involved allegations of injury from environmental contamination, and the court found that individual issues of injury and causation predominated over the common questions related to the contamination itself. 2016 WL 2943193.

[7] As I mentioned briefly at the class certification hearing, I also have concerns that, in the context of this particular case, any class-wide determination might not be binding on absent class members who do not opt out. Even following the appraisal process plaintiff describes, any

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for class certification [11] is denied.

**IT IS FURTHER ORDERED** that this case is set for an additional scheduling conference on **Friday, August 19, 2016 at 11:00 a.m. in Chambers 14 South.** In advance of the scheduling conference counsel must meet and confer and attempt to agree on a schedule for all matters required to complete this case, including all matters referenced in the original Order Setting Rule 16 Conference that was issued on August 24, 2015 [docket entry # 5]. Counsel shall file a joint proposed scheduling plan no later than **Tuesday, August 16, 2016.**

                                                          CATHERINE D. PERRY
                                                          UNITED STATES DISTRICT JUDGE

Dated this 18th day of July, 2016.

---

absent class member could later say that her claim was actually for more than $10,000, and so she did not need to opt out of a class covered by the Little Tucker Act. Although plaintiffs propose that putative class members can waive claims over $10,000, that would not solve the problem for potential class members who did not opt out but later dispute a valuation related to their own property and then challenge whether they are bound by any class-wide resolution of this case.